## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO, EASTERN DIVISION

IN RE: WELING FUME PRODUCTS
      LIABILITY LITIGATION
-----------------------------------------------------------------

THIS DOCUMENT RELATES TO:

MICHAEL PITTMAN AND GENEVA
PITTMAN
             PLAINTIFFS


     vs.

LINCOLN ELECTRIC COMPANY;
HOBART BROTHERS COMPANY;
ILLINOIS TOOL WORKS, INC.; THE ESAB
GROUP, INC.; SELECT ARC, INC.; BOC
GROUP, INC. f/k/a AIRCO, INC.;
PRAXAIR, INC., CBS CORPORATION, a
Delaware corporation, f/k/a VIACOM INC.,
successor by Merger to CBS
CORPORATION, a Pennsylvania
Corporation, f/k/a WESTINGHOUSE
ELECTRIC CORPORATION; GENERAL
ELECTRIC COMPANY; UNION CARBIDE
CORPORATION f/k/a UNION CARBIDE
CHEMICALS AND PLASTICS COMPANY,
INC.; EUTECTIC CORPORATION; A. O.
SMITH CORPORATION; SANDVIK, INC.;
DELORO STELLITE COMPANY, INC.;
ARCOS INDUSTRIES, L.L.C.; INC.;
AVESTA POLARIT WELDING, INC.;TDY
INDUSTRIES, INC.; THERMADYNE
HOLDINGS CORPORATION; and JOHN
DOE DEFENDANTS A-Z,

          DEFENDANTS.

CASE NO.: _____


Case No.: 1:03-17000
(MDL Case No. 1535)



JUDGE: O'MALLEY

__TOLLED CLAIMS__
__ORIGINAL COMPLAINT__

(Jury Demand Endorsed
Hereon)

Plaintiffs, for their Complaint, allege as follows based upon personal knowledge as to their own acts, and upon information and belief as well as their attorneys' investigation as to the acts of Defendants:

## THE PARTIES

1.      Plaintiffs are residents of the City of Fort Worth, County of Tarrant, and State of Texas.  Plaintiff, Micahel Pittman, ("Plaintiff") has suffered and continues to suffer severe physical and emotional injuries, some or all of which may be permanent, and has incurred and will continue to incur medical expenses, as a result of exposure to toxic fumes from welding rods.

2.      Lincoln Electric Company ("Lincoln"), Defendant herein, is a corporation incorporated under the laws of Ohio, and its registered agent is H. Jay Elliott, 22801 St. Clair Ave., Cleveland, Ohio 44117.

3.      Hobart Brothers Company ("Hobart"), Defendant herein, is a corporation incorporated under the laws of Ohio, and its registered agent is C.T. Corporation System, 1300 E. Ninth St., Cleveland, Ohio 44114.

4.      Illinois Tool Works, Inc. ("Illinois Tool Works"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is C.T. Corporation System, 1300 E. Ninth St., Cleveland, Ohio 44114.

5.      The ESAB Group, Inc. ("ESAB"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is C.T. Corporation System, 1300 E. Ninth St., Cleveland, Ohio 44114.

6.      Select Arc, Inc., ("Select Arc"), Defendant herein, is a corporation incorporated

under the laws of Ohio, and its registered agent is Paul E. Zimmer, 2700 Ketting Tower, 40 N. Main St., Dayton, OH 45423.

7.     BOC Group, Inc. f/k/a Airco, Inc. ("Airco"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is C.T. Corporation System, 1300 E. Ninth St., Cleveland, OH 44114.

8.     Praxair, Inc. ("Praxair"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is Prentice-Hall Corporation System, 50 West Broad Street, Suite 1800, Columbus, Ohio 43215.

9.     CBS Corporation ("CBS"), A Delaware Corporation, F/K/A Viacom Inc., Successor By Merger To CBS Corporation, A Pennsylvania Corporation, F/K/A Westinghouse Electric Corporation, Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is Corporation Service Company, 80 State Street, Albany, New York 12207, Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is Corporation Service Company, 80 State Street, Albany, New York 12207.

10.     General Electric Company ("General Electric"), Defendant herein, is a corporation incorporated under the laws of New York, and its registered agent is C.T. Corporation System, 1300 E. Ninth St., Cleveland, OH 44114.

11.     Union Carbide Corporation f/k/a Union Carbide Chemicals And Plastics Company, Inc. ("Union Carbide"), Defendant herein, is a corporation incorporated under the laws of New York, and its registered agent is C.T. Corporation System, 1300 E. Ninth St., Cleveland, Ohio 44114.

12.     Eutectic Corporation ("Eutectic"), Defendant herein, is a corporation organized under the laws of New York, and it can be served through it Chief Executive Officer, John

Kirkwood, Eutectic Corporation, N 94 W 14355 Garwin Mace Drive, Menomonee Falls, WI 53051 and through Quarles & Brady LLP, Mitchell S. Moser, 411 E. Wisconsin Ave., Suite 2040, Milwaukee, Wisconsin 53202.

13. A.O. Smith Corporation ("Smith"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is Prentice-Hall Corporation System, Inc., 80 State Street, Albany, New York 12207.

14. Sandvik, Inc. ("Sandvik"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is C. T. Corporation System, 1300 E. Ninth St., Cleveland, Ohio 44114.

15. Deloro Stellite Company, Inc. ("Deloro"), Defendant herein, is a corporation incorporated under the laws of Delaware, and its registered agent is at 900 South Highway Drive, Suite 104, St. Louis, MO 63026.

16. Arcos Industries, L.L.C., f/k/a Arcos Alloys d/b/a Hoskins Manufacturing Company ("Arcos"), Defendant herein is a limited liability company organized under the laws of the state of Michigan and may be served with process through its registered agent, Mark A. Sturing, 31731 Northwestern Highway, STE 250W, Farmington Hills, MI 48334.

17. Avesta Polarit Welding ("Avesta Polarit"), Defendant herein, is a corporation incorporated under the laws of New Jersey, and its registered agent is C.T. Corporation System, 111 Eighth Avenue, New York, NY 10011.

18. TDY Industries, Inc. ("TDY Industries"), Defendant herein, is a corporation incorporated under the laws of California, and its registered agent is C.T. Corporation System, 1300 E. Ninth St., Cleveland, OH 44114.

19. Thermadyne Holdings Corporation ("Thermadyne Holdings"), Defendant herein,

is a corporation incorporated under the laws of Delaware, and its registered agent is The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

20.     John Doe Defendants A-Z, Defendants herein, are of identities that are unknown to the Plaintiffs at this time, but when those parties' true identities are discovered, the pleadings will be amended by substituting their true names and giving proper notice under the Rules of this Court.  These Defendants include sellers, suppliers, distributors including "private label" distributors of products manufactured by  named herein Defendants, and manufacturers that at any time relevant to these proceedings, supplied welding equipment, supplies, and steel/metal products containing manganese to the site(s) at which Plaintiff was exposed to toxic fumes, and by virtue of which Plaintiff sustained the damages alleged herein.  John Doe Defendants A-Z also include unknown members of AWS, NEMA and TFA, whose negligence and breaches caused or contributed to cause the Plaintiffs' damages and injuries.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000 exclusive of interest and costs.

22.     Venue is proper in this District because Defendants reside in this District insofar as they manufactured, sold and/or marketed welding rods within this District, as well as in the District of residence of the Plaintiff, and throughout the United States, with the expectation that this product would be purchased and or used throughout this District and the United States. Further, venue is proper in that the multidistrict litigation to which this case is related, being In Re: Welding Rods Product Liability Litigation, MDL 1535, has been transferred to this District.

## FACTS

23.     At all times relevant hereto, Plaintiff was exposed to toxic fumes resulting from welding operations.

24.     The ordinary and intended use of welding products causes emission of fumes that contain, among other substances, manganese ("welding fumes").

25.     Since 1837, manganese has been medically and scientifically recognized as toxic to the human central nervous system in levels that exceed the trace amounts normally found in the human body.  Toxicity of manganese causes progressive, disabling neurological damage known alternatively as Parkinsonism secondary to manganese exposure, manganese induced Parkinsonism, manganese poisoning, manganism or neuropsychological injury.  People who suffer from manganese poisoning suffer from debilitating neurological problems that amongst other things affect their ability to think, talk, eat, move, sleep, and work.

26.     Persons exposed to welding fumes absorb them into their body primarily through inhalation.  Cases involving manganese exposure for a period as short as 49 days causing manganese poisoning and progressive, disabling, neurological damage have been documented.

27.     Plaintiff was exposed to welding fumes while using welding products and equipment or working in the proximity of other persons using welding products or equipment.

28.     As a direct and proximate result of exposure to welding fumes, the Plaintiff developed neurologic injury.

29.     As a direct and proximate result of exposure to welding fumes, the Plaintiff suffered, continues to suffer, and will continue to suffer permanent neurological and physical damage, severe physical and mental pain, loss of wages, loss of earning capacity, disability, medical expenses, and loss of enjoyment of life.

30.     At all relevant times, the Plaintiff was unaware of the dangerous nature of

welding fumes, manganese, and the neurological injuries that could occur because of exposure to welding fumes.

31. Any reasonable persons, including the Plaintiff, if adequately informed of the hazards of exposure to welding fumes and given proper instructions on avoidance of risk, would not have willingly exposed him or herself to welding fumes in workplaces without necessary precautionary measures.

32. All of the Defendants are or were manufacturers, sellers, suppliers or large industrial consumers of welding products or conspiracy defendants.

33. Through industry and medical studies, unknown to the Plaintiff, the Defendants knew or should have known of the health hazards inherent in the products they were selling, distributing, or using.

34. The Defendants ignored or deliberately and fraudulently concealed or minimized that information, or condoned the concealment or minimization , and/or conspired with, advised, encouraged, or aided others and/or each other to do so, in order to sell their products and/or avoid the costs of safety precautions, and/or avoid litigation by people injured by welding fumes.

35. Defendants' actions and omissions constitute gross negligence and demonstrate a reckless disregard for the rights and safety of others, justifying punitive damages against the Defendants.

36. The Defendants committed numerous tortious acts that included fraudulently and negligently misrepresenting, concealing, suppressing, and omitting material information about the health effects of welding fumes and precautionary measures as specifically alleged below.

37. NEMA is a trade organization comprised of manufacturers that has a section

devoted to the manufacturers of welding products known as "NEMA Electric Welding Section" or "NEMA Arc Welding Section" ("NEMA Welding Section").

38.     TFA is an industry advocacy group consisting of producers of chromium, manganese, silicon, and vanadium ferroalloys that sponsored a manganese subcommittee that includes representatives from welding manufacturers and the AWS and NEMA. The TFA's membership included management representatives of companies that produce welding products and large consumers that purchase the products for use in their operations.

39.     The Defendants created committees within these trade organizations and then used the committees to fraudulently and negligently misrepresent, conceal, suppress, and omit material information about the health effects of welding fumes and necessary precautionary measures.

40.     Specific examples of the trade association committees controlled by Defendants and their activities are identified below.

41.     The Defendants controlled and used the committees to conceal or minimize the dangers from people exposed to welding fumes by:

  a.      limiting individual membership on relevant committees exclusively or primarily to employees of the Defendants or their designated representatives;

  b.      maintaining, through Defendants' delegates, majority or exclusive voting control of the committees at all times;

  c.      selecting the assignments or proposals considered by each committee;

  d.      funding projects chosen by Defendants;

  e.      using the Defendants' delegates to prepare the written records of the business transacted by each committee;

  f.      reviewing and editing, to the satisfaction of the Defendants, studies performed by consultants hired by the committees.

42.     From at least 1937 to the present, the Defendants, by their actions and through trade association committees they controlled, undertook studies, issued product labels and other health and safety information, and issued specifications and standards for ventilation, safety equipment, and other precautionary measures.

43.     At all times, the Defendants acted with the intent to conceal or minimize the health hazards of welding fumes, and specifically manganese, knowing that their studies, publications, specifications, and standards would be adopted and relied upon by manufacturers, sellers, and consumers of welding products, as the authoritative source for warnings, instructions, and precautionary measures printed on product labels and otherwise distributed in the stream of commerce.

44.     The Defendants had actual knowledge about the causal relationship between manganese-containing welding fumes and neurologic injury.  However, by the use of voluntarily adopting weak warnings, using no warnings, influencing the content of industry wide weak warnings;, lobbying government, regulators and standard groups or associations to mandate warnings that misrepresent true product risk, and/or producing media that deliberately misrepresented dangerous products as safe in order to contradict or eviscerate true product risk apprehension, Defendants effectively concealed or minimized or intentionally misrepresented this information regarding the true risks from welding fumes from workers' exposed to welding fumes.

45.     The causal connection between neurological injuries and welding fumes containing manganese was scientifically documented no later than 1932 and Defendants have admitted knowing that manganese in welding fumes can cause neurological injury since the 1940's.

46.     Beginning in 1985 and continuing to the present, certain Defendants admitted in their Manufacturer Safety Data Sheets ("MSDS"), that are technical documents not intended for reading by welders, their knowledge that manganese in welding fumes could cause neurological damage. Defendants further knew that MSDS's were by themselves an ineffective form of communication of hazards or that their MSDS's did not convey the message that manganese in welding fumes was a neurotoxin.

47.     Because not all Defendants attended each meeting, it was a regular practice of the trade association committees to publish written minutes that were disseminated to all committee members, including those not in attendance, for the purpose of ratifying and adopting the actions taken and decisions made at the meetings.

48.     At a meeting of NEMA's Welding Section held on March 16, 1937, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards associated with welding fumes by forming a "Dust and Smoke Committee" to preempt investigation of welding fume hazards by independent sources that were not controlled by the Defendants.

49.     During meetings of NEMA's Welding Section held between January 20 and June 23, 1938, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by changing the language of a publication issued by an insurance company to delete the original statement in the publication that manganese in welding fumes causes a disabling illness similar to Parkinson's Disease.

50.     In 1939-40, at meetings of NEMA's Welding Section, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal or minimize the hazards of welding fumes by purporting to undertake an investigation of the health hazards of

welding fumes and then, upon its completion, changing the conclusions of the study, so as to falsely represent that welding fumes were not harmful to welders.

51. In 1949, as part of a scheme to create and disseminate false evidence useful in defending against claims brought by persons injured by exposure to welding fumes, Defendant members of NEMA's Arc Welding Section agreed to and did intentionally, knowingly, and recklessly conceal known hazards of welding fumes by providing information for and causing publication in a welding trade journal of a two-part article that made the misrepresentation that welding fumes were not toxic.

52. In 1949 and 1951, at meetings of NEMA's Arc Welding Section which considered precautionary measures, the Defendants in attendance agreed to and did intentionally, knowingly, and recklessly conceal or minimize the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products because the Defendants feared that welders would be afraid to use welding products if they saw precautionary product labels, and therefore sales of welding products would be reduced.

53. In 1952, the Defendants reorganized the AWS Safety Recommendations Committee and called a meeting to consider the furnishing of safety and health information at which they agreed to, and did intentionally, knowingly, and recklessly conceal or minimize the health hazards of welding fumes by rejecting the adoption of any precautionary product labels for welding products.

54. In 1952, at a meeting of the AWS Safety Recommendations Committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly adopt a policy of refuting existing reports of welding fume hazards by publishing their own reports that misrepresented exposure to welding fumes as safe.

55.     In 1957, the Defendants agreed to, and did intentionally, knowingly, and recklessly conceal or minimize the health hazards of welding fumes by sponsoring the publication of an article in the *Welding Engineer* trade publication that made the misrepresentation that "toxic gases are not produced by electrode coatings."

56.     In 1966, at meetings of the AWS A5 Filler Metal Committee and a task group, the Defendants in attendance intentionally, knowingly, and recklessly agreed to publication in a trade journal or an article misrepresenting the health hazards of welding fumes as causing only "temporary disability."

57.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance agreed to, and did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by establishing industry-wide specifications for precautionary product labels that failed to warn workers of the danger of manganese in welding fumes.  This precautionary label stated:

> Welding may produce fumes and gases hazardous to health.  Avoid
> breathing these fumes and gases.  Use adequate ventilation.  See
> USAS Z49.1 "Safety in Welding & Cutting," published by the
> American Welding Society.

58.     In 1966, at meetings of the A5 Filler Metal Committee of the AWS and a Task Group of that committee, the Defendants in attendance established industry-wide specifications for precautionary product labels that did intentionally, knowingly, and recklessly omit instructions about necessary ventilation, precautionary measures, and other information, needed to protect workers against the toxic effect of manganese.

59.     In 1966-67, through votes on a ballot distributed to the Defendants through the A5 Filler Metal Committee of the AWS, the Defendants did intentionally, knowingly, and recklessly approve, as part of the AWS required specifications for most welding products, a precautionary

product label concealing health hazards from welding fumes and omitting instructions about necessary ventilation, precautionary measures, and other information.

60.     From 1975-79, the Defendants, through the AWS Committee on Safety and Health, did intentionally, knowingly, and recklessly conceal or minimize the known hazards of welding fumes by providing information that misrepresented the hazards associated with welding fumes as part of a deliberate scheme to prevent an independent standard-setting organization from lowering the occupational exposure guidelines for iron oxide and general welding fumes.

61.     In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA's Arc Welding Section, Defendants intentionally, knowingly, and recklessly established industry-wide specifications for precautionary product labels that concealed or minimized the health hazards of welding fumes by omitting any reference to the toxic effects of manganese in welding fumes.

62.     In 1979, at meetings of a joint AWS-NEMA committee consisting of a special Task Group of the A5 Filler Metal Committee of the AWS and the Labeling and Safe Practices Committee of NEMA, the Defendants did intentionally, knowingly, and recklessly establish industry specifications for precautionary measures, and other information needed to protect workers against the toxic effects of manganese in welding fumes.

63.     In 1979, through votes on a ballot distributed to the Defendants through the AWS-NEMA Joint Committee On Precautionary Labels and the A5 Filler Metal Committee of the AWS, the Defendants did intentionally, knowingly, and recklessly approve as part of the required industry-wide specifications for most welding products a precautionary product label concealing health hazards and omitting instructions about necessary ventilation, precautionary

measures, and other information.  This precautionary label stated in pertinent part:

> "WARNING: Protect yourself and others.  Read and understand this label.
>
> FUMES AND GASES can be dangerous to your health.
>
> Read and understand the manufacturer's instructions and your employer's safety practices.
>
> Keep your head out of the fumes.
>
> Use enough ventilation, exhaust at the arc, or both, to keep the fumes and gases from your breathing zone, and the general area.
>
> See American National Standard Z49.1 "Safety in Welding and Cutting" published by the American Welding Society."

64.     Beginning in 1979 and continuing until the present time, at meetings of the AWS Technical Council and Board of Directors, the Defendants in attendance did intentionally, knowingly, and recklessly conceal or minimize the health hazards of welding fumes by failing and refusing to perform an epidemiological study, recommended by other AWS committees and an independent consultant retained by the Defendants, to investigate the neurological effects of welding fumes on persons exposed to welding fumes.

65.     In 1980, at meetings of NEMA's Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly conceal health hazards of welding fumes by approving industry specifications for precautionary product labels for welding power sources that omitted reference to the toxic effects of manganese in welding fumes on persons exposed to welding fumes.

66.     Beginning in 1980, at meetings of the NEMA Ad Hoc Committee on Precautionary Labeling, the Defendants in attendance did intentionally, knowingly, and recklessly approve industry specifications for precautionary product labels for welding power sources that omitted necessary instructions about ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

67.     Beginning in 1980 and continuing until 1996, at meetings of the NEMA MSDS Task Force Committee and the AWS SH-4 Ad Hoc Committee on Suggestions and Changes to NEMA Publication EW 5-1982, the Defendants in attendance did intentionally, knowingly, and recklessly agree to conceal health hazards of welding fumes by adopting a recommended format for the Hazardous Material and Health Hazard Data sections of the Material Safety Data Sheets (MSDS) for welding products that omitted reference to the manganese content of welding fumes, the neurological damage caused by manganese in welding fumes, and necessary instructions for protection against the health hazards of welding fumes.

68.     Beginning in 1993 and continuing to the present time, the Defendants, through the AWS Safety and Health Committee and NEMA Welding Section, did intentionally, knowingly, and recklessly seek to conceal or minimize the health hazards of manganese in welding fumes by appointing designated representatives to become committee members of, and providing funding for, a trade organization called The Ferroalloys Association ("TFA"), which opposes restrictions on the guidelines for manganese exposure levels established by various authorities.

69.     In 1993-95, the Defendants, through the above described organization sponsored by the AWS Safety and Health Committee and NEMA Welding Section, as part of a scheme to prevent the lowering of occupational exposure guidelines for manganese in welding fumes established by the American Conference of Governmental Industrial Hygienists ("ACGIH"), did intentionally, knowingly, and recklessly seek to conceal or minimize the health hazards of manganese in welding fumes by providing false and misleading information that exposure to manganese in welding fumes did not cause neurological injury

### FIRST CLAIM – COMMON LAW FRAUD – FAILURE TO DISCLOSE

70.     The Plaintiffs re-allege and incorporate the foregoing allegations as if fully

rewritten herein.

71.    Defendants committed common law fraud against the Plaintiff.

72.    These Defendants failed to disclose and concealed or minimized material facts within their knowledge.

73.    These Defendants knew that the Plaintiff was ignorant of the fact and did not have an equal opportunity to discovery the truth about the dangers presented by Defendants' products.

74.    These Defendants intended to induce the Plaintiff to take some action, among other things, to buy and use their products, by failing to disclose the fact.

75.    Plaintiff relied on Defendants' fraud; but for Defendants' fraud, he would not have been exposed to manganese in welding rod fumes.

76.    Plaintiffs suffered injury as a result of acting without knowledge of the undisclosed facts.

## SECOND CLAIM-- NEGLIGENCE

77.    The Plaintiffs re-allege and incorporate the foregoing allegations as if fully rewritten herein.

78.    At all relevant times, it was reasonably foreseeable by the Defendants that welders and persons in proximity to welding fumes, including the Plaintiff would be exposed to welding fumes containing manganese by using welding products or working in proximity of other workers using welding products.

79.    The Defendants have the duty imposed by common, regulatory and/or statutory law, or have assumed the duty, to exercise reasonable care for the safety of the Plaintiff and similarly situated persons.

80.    Because exposure to welding fumes presents a risk of physical harm, all

Defendants had a legal duty to exercise reasonable care for the safety of the Plaintiff when making representations about welding safety and health in warning labels, publications, and instructions for ventilation and other precautionary measures.

81.     The Defendants knew, or in the exercise of ordinary care should have known, that persons exposed to welding fumes would act in reliance upon representations or silence made by the Defendants about the health hazards associated with welding fumes and the precautionary measures required to protect against those health hazards.

82.     The Defendants knew, or in the exercise of ordinary care should have known, that welding fumes would cause neurological damage to workers like the Plaintiffs.

83.     The Defendants breached their duty of reasonable care and were negligent, without regard to whether the acts were intentional, knowing, or reckless.

84.     Beginning in 1970, the Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

85.     The Defendants violated industry standards about health and safety as set forth in the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate warning of precautionary instructions and other information to welders or persons in the proximity to welding fumes about the standard.

86.     Defendants' negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

### THIRD CLAIM -- NEGLIGENCE-SALE OF PRODUCT

87.     The Plaintiffs re-allege and incorporate the foregoing allegations as if fully

rewritten herein.

88.     Certain Defendants, during some or all relevant times, manufactured sold, and/or distributed welding products that were supplied to the Plaintiff for use.

89.     The Plaintiff was exposed to welding fumes containing manganese from products sold by these Defendants, while using the products or working in the proximity of others using the products.

90.     These Defendants had the duty, as product sellers, to exercise reasonable care for the safety of the Plaintiff.

91.     These duties included the responsibility for the following safety and health matters relating to welding fumes:

   a.  the investigation of the health hazards;

   b.  writing and publishing adequate and timely precautionary product labels and other health and safety information; and

   c.  writing and publishing adequate and timely specifications and standards about ventilation, safety equipment, and other precautionary measures.

92.     The Defendants knew, or in the exercise of reasonable care should have known, that welding fumes would cause neurological damage to welders like the Plaintiff.

93.     The Defendants breached their duty of reasonable care to the Plaintiff and were negligent, without regard to whether the acts were intentional, knowing, malicious or reckless.

94.     Beginning in 1970, the Defendants violated OSHA standards about publication of information about health hazards through MSDS guidelines that omitted necessary instructions about target organs, ventilation, precautionary measures, and other information needed to protect against the toxic effects of manganese in welding fumes.

95.     The Defendants violated industry standards about health and safety as set forth in

the Z49 documents adopted by the AWS sponsored Z49.1 committee beginning in 1950 by failing to publish adequate and timely warning of precautionary instructions and other information to welders or persons in the proximity to welding fume about the standard.

96.     Defendants' negligent acts and omissions were the direct and proximate causes of the occurrence in question and Plaintiff's injuries and damages.

## FORTH CLAIM – STRICT LIABILITY – UNREASONABLY DANGEROUS PRODUCT – MARKETING DEFECT -- MISREPRESENTATION

97.     The Plaintiffs re-allege and incorporate the foregoing allegations as if fully rewritten herein.

98.     Certain defendants are manufacturers, sellers or distributors of welding products that produce manganese-containing welding fumes.  These products were expected to and did reach various industrial and commercial locations, where Plaintiff's exposure occurred, without substantial change in the condition of the product from that in which it was sold.

99.     The Plaintiff was exposed to welding fumes containing manganese from products sold by the seller Defendants, while using the products or working in the proximity of others using the products.

100.    The Defendants' products are unreasonably dangerous because, when used for their reasonably foreseeable and intended purposes in the welding process, they produce harmful fumes that cause neurological injuries.

101.    The Defendants' products are defective because:

    a.   adequate and timely warnings were not provided to users that the products product harmful fumes;

    b.   adequate and timely instructions were not provided to users about ventilation, safety equipment, or other precautionary measures;

    c.   the Defendants failed to test or investigate the health hazards associated with the products; and,

    d.   the Defendants represented to the public that welding was generally safe when it was not, Plaintiff relied on the representation and was damaged, and Plaintiff invokes Restatement (Second) of Torts §402B for all purposes.

102.    The defects in the Defendants' products existed when the products left the Defendants' control.

103.    The defects in the Defendants' products were the producing and proximate causes of the occurrences in question and Plaintiff's injuries and damages.

104.    At all relevant times, the Plaintiff had no knowledge of the defects in the Defendants' products.

## FIFTH CLAIM -- WARRANTY

105.    The Plaintiffs re-allege and incorporate the foregoing allegations as if fully rewritten herein.

106.    At all relevant times, Defendants expressly warranted in words and substance that welding products were generally safe which proved to be false. That wrongful and misleading conduct was a producing and/or proximate cause of the occurrence and Plaintiff's injuries and damages.

107.    Plaintiff relied upon Defendants' warranties to his detriment.

## SIXTH CLAIM - - LOSS OF CONSORTIUM

108.    The Plaintiffs re-allege and incorporate the foregoing allegations as if fully rewritten herein.

109.    As a direct and proximate result of Defendants' wrongful conduct detailed above, Plaintiff/spouse of Plaintiff who was exposed to toxic fumes from welding rods was and continue to be deprived of the care, consideration, compassion, consortium and concern of Plaintiff, and

has suffered, and will continue to suffer, injuries and damages thereby, entitling Plaintiff/spouse to an award of damages for loss of consortium.

## SEVENTH CLAIM -- DAMAGES / PUNITIVE DAMAGES

110.    The Plaintiffs re-allege and incorporates the foregoing allegations as if fully rewritten herein.

111.    As a proximate result of all the Defendants' breaches of their duties to the Plaintiff sustained, and will sustain, welding fume-related injuries, conditions, and damages, including past and future pain, suffering and disfigurement; past and future medical treatment and medical expenses; past lost wages and future disability; past and future impairment of earning capacity; a diminution in his quality and enjoyment of life; and past and future emotional distress.

112.    All Defendants were grossly negligent, malicious and acted in reckless disregard of the safety of the Plaintiff and others, justifying the imposition of punitive damages. The Plaintiff is entitled to punitive damages because of the Defendants' gross negligence and reckless disregard of the Plaintiffs' safety.

## EIGHTH  CLAIM-- AIDING AND ABETTING, ACTING IN CONCERT, AND JOINT AND CONCURRENT TORTFEASERS IN THE TORTIOUS FAILURE TO WARN PLAINTIFF

113.    The Plaintiffs re-allege and incorporate the foregoing allegations as if fully rewritten herein.

114.    Defendants all at one time or another manufactured and/or distributed welding consumables, welding machines, and equipment.

115.    All of these Defendants, both individually and collectively, aided and abetted the Defendants who manufactured the welding consumables and welding machines used by the Plaintiff (hereinafter referred to as "Warning Defendants") tortious failure to warn the Plaintiff

and his employers of the health hazards of exposure to manganese in welding fumes under Restatement (Second) of Torts §876(b) as alleged herein.

116.    Moreover, these Defendants also acted in concert in their tortious failure to warn Plaintiff and his employers of the adverse health effects of exposure to manganese in welding fumes pursuant to their common plan or design to fail to warn Plaintiff and other welders that manganese in welding fumes could cause neurological injury under Restatement (Second) of Torts § 876(a) as alleged herein.

117.    Lastly, Defendants were joint and concurrent tortfeasors in the Warning Defendants' tortious failure to warn Plaintiff and his employers of the adverse health effects of exposure to manganese in welding fumes as alleged herein.

118.    Defendants, through their knowledge, review, and survey of the scientific literature, starting with the Couper and Beintker articles, the Met Life publications, and up through the present day, knew that exposure to manganese in welding fumes could cause severe neurological injury, including but not limited to  manganism, parkinsonism, and Parkinson's Disease.

119.    Defendants, through their membership and participation in AWS and/or NEMA as well as through their own independent knowledge, knew that other welders, including, but not limited to,  A.C. Nobles, Lonnie Wisenhunt, certain Miami welders and  Charles Ruth had developed neurological injury for exposure to welding fumes, and had filed lawsuits based on such injuries.

120.    Defendants, through their own testing and studies, consultants and experts, membership and participation in AWS and/or NEMA, and/or knowledge of the scientific literature, knew that there is no known "safe level" of exposure to Manganese in welding fumes,

that compliance with the OSHA PEL and ACGIH TLV for manganese is not sufficient to protect welders exposed to manganese in welding fumes, and that welders were developing neurological injury with exposures under PEL limits.

121.    In addition and in conjunction with this knowledge set forth above, Defendants also knew that Warning Defendants were failing to adequately warn the Plaintiff or his employers of the health hazards associated with exposure to manganese in welding fumes. Rather, Defendants knew that the Warning Defendants  and the rest of the welding industry had been historically underwarning, downplaying, understating, and/or under-emphasizing the hazards of exposure to manganese in welding fumes since the 1930's.

122.    For example, Defendants knew that Warning Defendants' warnings to plaintiff were inadequate because they did not adequately inform the Plaintiff that  manganese was in both the welding consumable and in the welding fume; or of the amount of manganese in the welding fume; or that flux core wire emits more fume than regular stick electrodes; or that exposure to manganese in welding fume could cause neurological injury and/or brain damage; or that there is no known safe level of exposure to manganese in welding fumes; or that compliance with the PEL and TLV exposure limits does not ensure safety; or that exposure to manganese in welding fumes has been documented to cause neurological injury to welders in as little as two (2) months of exposure; or that an air supplied respirator is the only way that can assuredly protect plaintiff from exposure to manganese in welding fumes.

123.    Defendants also knew that the statements in the warning that Warning Defendants provided to the Plaintiff to use "adequate ventilation" and that "fumes and gases can be dangerous to your health" were vague, incomplete, confusing, and did not constitute a sufficient warning of the hazards of manganese in welding fume.

124.    Defendants further knew that welders did not understand or have access to Z49.1 or other "safety and health" information.

125.    Defendants also knew of the judgments and settlements of lawsuits filed by A.C. Nobles, Lonnie Wisenhunt, and the Miami welders, all of which alleged inadequate warnings concerning welding fumes.  In particular, Defendants knew that the Judge in the A.C. Nobles case made a judicial finding that the warning provided to that plaintiff was inadequate.

126.    Moreover, Defendants knew that the Warning Defendants failed to adequately investigate and/or test the health hazards of manganese in welding fumes emitted from Warning Defendants' products.

127.    However despite their knowledge of the health hazards associated with exposure to manganese in welding fumes and that the Warning Defendants were failing to warn Plaintiff of such dangers, Defendants substantially assisted and encouraged the Warning Defendants' failure to warn and further, acted in concert and as joint and concurrent tortfeasors with the Warning Defendants in their tortious breach of duties to warn Plaintiff in the following ways.

128.    From approximately 1937 until approximately 1966, Defendants, and in particular Defendants Westinghouse, Miller Electric, ARCOS, General Electric, TDY, BOC/Airco, ESAB, Eutectic, A.O. Smith, Lincoln Electric, and Union Carbide, individually, collectively, and through their participation and involvement in  NEMA's Electric and Arc Welding Committees and the AWS, made, approved, supported, ratified and endorsed the decision not to warn welders about the adverse health effects of exposure to manganese in welding fumes, although they knew exposure to such fumes could be dangerous.   Defendants, both individually, collectively, and through their participation and involvement in NEMA and the AWS, also encouraged and mandated that the Warning Defendants and all other welding consumable manufacturers present

a united front on safety and warning issues and not to warn of the adverse health effects associated with exposure to manganese in welding fumes. Defendants, through such conduct and actions, substantially assisted and encouraged the Warning Defendants not to adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants also acted in concert with the Warning Defendants in their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

**129.** Starting with the AWS' June 8, 1966 "Filler Metal" Committee Meeting, Defendants, and in particular Defendants Westinghouse, Miller Electric, ARCOS, General Electric, TDY, BOC/Airco, Eutectic, ESAB, A.O. Smith, Lincoln Electric, Union Carbide, Stoody and Hobart, individually, collectively, and through their participation and involvement in AWS's "Cautionary Label for Filler Metal" and "Filler Metal" Committees and in NEMA, proposed, drafted, supported, approved, endorsed, ratified and assisted in the development of a vague, confusing, incomplete, and inadequate warning used by the Warning Defendants on their welding consumables that they knew did not sufficiently warn welders or Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Defendants were even advised by fellow Defendant Westinghouse that such developed warning was inadequate.

In addition, from 1966 until approximately 1979, Defendants, both individually, collectively, and through their participation and involvement in the AWS Committees and NEMA, also encouraged and mandated Warning Defendants and all other welding consumable manufacturers use, maintain and not deviate from the inadequate warnings developed and approved by Defendants, AWS, and NEMA. Defendants knew that this weak and inadequate warning was placed on the welding consumables that the Plaintiff used from 1966 to 1979.

Defendants also incorporated and maintained such inadequate warnings on their own welding consumables from 1966 to 1979.   Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants to not adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes.  Through such conduct, Defendants also acted in concert with Warning Defendants in their common design to fail to warn Plaintiffs and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

     **130.**    Starting with the AWS Special A5 Task Group on Warning Labels "Letter Ballot" in March 1979, Defendants, both individually, collectively, and through their participation and involvement in AWS and NEMA, proposed, drafted, supported, approved, ratified,  endorsed, and assisted in the promulgation of an amended vague, confusing, incomplete, weak, and inadequate warning used by Warning Defendants on their welding consumables that they knew did not sufficiently warn welders or Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes.  Defendants, both individually, collectively,  and through their participation and involvement in AWS and/or NEMA's Labeling and Safety and Health Committees, also encouraged and mandated Warning Defendants and all other welding consumable manufacturers present a "united front" and not deviate from the inadequate warnings developed and approved by Defendants, AWS, and NEMA.  Defendants knew that this weak and inadequate warning was placed on the welding consumables that the Plaintiff used.  Defendants also incorporated and maintained such inadequate warnings on their own welding consumables. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes.   Through such conduct, Defendants also acted in

concert with Warning Defendants pursuant to their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

131. On May 11, 1982, during an AWS "Safety and Health" Executive Committee Meeting, Defendants Lincoln Electric, TDY, Union Carbide, Hobart, General Electric, BOC/Airco, and Caterpillar, despite their knowledge of a welder (Lonnie Wisenhunt) who suffered manganese poisoning from his experience to welding fumes, decided not to warn welders and the plaintiff about the dangers of manganism in welding fumes. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn the Plaintiff about the adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants also acted in concert with Warning Defendants in their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

132. During a June 5, 1984 AWS "Safety and Health" Executive Committee Meeting, Defendants Lincoln, BOC/Airco, Caterpillar, General Electric, TDY, and Union Carbide, despite their knowledge that "much of the safety and health information published to date never gets to the welder, the individual that most needs it," decided not to take any proactive steps to adequately inform welding about the dangers of exposure to manganese in welding fumes. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn Plaintiff about the hazards of exposure to Manganese in welding fumes. Through such conduct, Defendants also acted in concert with Warning Defendants in their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

**133.** From the mid 1990s up to the present day, Defendants, both individually, collectively, and through their participation and involvement in AWS and NEMA's Labeling and Safety and Health Committees, have continued to support, approve, endorse, ratify, and maintain a warning on Warning Defendants' welding consumables that they know fails to adequately inform Plaintiff and other welders of the hazards of manganese in welding fumes or how to avoid them. Defendants, through such conduct and actions, substantially assisted and encouraged Warning Defendants not to adequately warn the Plaintiff of the adverse health effects associated with exposure to manganese in welding fumes. Through such conduct, Defendants also acted in concert with Warning Defendant in their common design to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasors with Warning Defendants in their failure to warn.

**134.** Defendants also substantially assisted, acted in concert pursuant to a common plan, and acted as joint tortfeasors with Warning Defendants' failure to warn Plaintiff about the adverse health effects of exposure to manganese in welding fumes through their manipulation of the medical and scientific literature and their dissemination of false and misleading articles about welding which falsely downplayed and understated the hazards of exposure to manganese in welding fumes.

**135.** In January 1938, Defendants ARCOS, General Electric, Lincoln Electric, TDY, and Westinghouse decided to wrongfully persuade Met Life to alter a publication titled "Health Protection of Welders," because it stated that manganese in welding fumes could cause neurological injury and mentioned the need for respirators by welders. Defendants' attempts were successful, and by the late 1940s, Met Life had removed and conceded any reference to exposure to manganese in welding fumes being dangerous.

**136.** In May 1943, Defendants Union Carbide and General Electric caused to be published a false and misleading article in the *Journal of the American Welding Society* that was designed to downplay and understate the hazards of manganism in welding fumes.

**137.** On July 11, 1951, Defendant Lincoln Electric caused to be published a false and misleading article stating that manganese in welding fumes had a "clean bill of health." Defendant Lincoln Electric published a similar false and misleading publication in its Handbook of Arc Welding in 1956.

**138.** In October 1957, Defendants caused to be published and/or frequently distributed an article in *The Welding Engineer* titled "Welding Hazards: Our Modern Day Mythology", which falsely stated that manganese in welding fumes were not dangerous. Defendants, and in particular Lincoln Electric, disseminated this article to employers and other consumers who questioned the safety of exposure to welding fumes.

**139.** In a June 19, 1967 AWS "Cautionary Label for Filler Metal" Committee Meeting, Defendants, and in particular Defendants BOC/Airco, General Electric, TDY, and ARCOS, in an attempt to deflect attention away from the inadequate warning label Defendants had developed, decided to prepare and disseminate an article to downplay and under emphasize the new warning, an article they described themselves as "slanted," and successfully completed this project in that same year.

**140.** In March 1978, Defendants General Electric and TDY attempted to remove advertisements in *The Welding Journal* that promoted welder safety and discussed the health hazards of welding fumes because it hurt their business.

**141.** In a September 25, 1978 NEMA "Arc Welding" Section Committee Meeting, Defendants BOC/Airco, Alloy Rods, ARCOS, Hobart, Lincoln Electric, Miller Electric, Stoody,

TDY, Union Carbide, and Westinghouse formed a committee called "The Welding Council" to minimize and downplay the health hazards of exposure to welding fumes and persuade OSHA not to further regulate the industry in regards to welding fumes.

142. Since the 1930's and up to the present day, Defendants have funded and assisted in medical/scientific articles and studies, and in particular articles and studies written or performed by *inter alia* Drs. Warren Olanow, Karl Kiebertz, William Jankovic, Caroline Tanner and Bill Langston, which have misrepresented and falsely downplayed the risk of neurological injury from manganese in welding fumes.

143. Defendants' conduct and actions in this regard have substantially assisted and encouraged Warning Defendants not to adequately warn Plaintiff about the adverse health effects associated with exposure to manganese in welding fumes.  Through such conduct, Defendants acted in concert with Warning Defendants in their common plan not to warn Plaintiffs or other welders, and further, as joint and concurrent tortfeasors in Warning Defendants failure to warn.

144. Defendants further substantially assisted, acted in concert pursuant to a common plan, and acted as joint and concurrent tortfeasors in Warning Defendants failure to warn by their efforts to oppose the lowering of exposure levels for Manganese, by governmental and quasi-governmental agencies, and in particular, the lowering of OSHA's PEL and ACGIH's TLV for Manganese, to a safe and appropriate level.

145. In the mid to late 1970's, Defendants attempted to prevent ACGIH from lowering the TLV for Manganese from 5 mg/m$^3$ to 1 mg/m$^3$.

146. In the early 1990's, Defendants successfully thwarted OSHA's attempt to lower the PEL for Manganese from 5 mg/m$^3$ to 1 mg/m$^3$.

147. In the mid 1990's, Defendants, and in particular Defendants Lincoln Electric and

Caterpillar, both individually, collectively, and through their membership,  participation, and funding of AWS, NEMA, and "The Ferroalloys Association," attempted to prevent the ACGIH from lowering the TLV for Manganese from 1 mg/m$^3$  to 0.2 mg/m$^3$ although they knew that exposure at such levels was hazardous.

148.    Defendants, through such conduct and actions, substantially associated and encouraged Warning Defendants not to adequately warn the Plaintiff of the adverse health effects of exposure to Manganese in welding fumes at such levels.  Through such conduct, Defendants also acted in concert with Warning Defendants pursuant to their common plan to fail to warn Plaintiff and other welders, and further, as joint and concurrent tortfeasers with Warning Defendants in their failure to warn.

### NINETH CLAIM--AIDING AND ABETTING, ACTING IN CONCERT, AND JOINT AND CONCURRENT TORTFEASERS IN THE FAILURE TO INVESTIGATE AND TEST THE HEALTH HAZARDS OF EXPOSURE TO MANGANESE IN WELDING FUMES

149.    The Plaintiffs re-allege and incorporate the foregoing allegations as if fully rewritten herein.

150.    All of these Defendants, both individually and collectively, aided and abetted each other and Warning Defendants' tortious failure to investigate the welding consumables and machines the Plaintiff used for any adverse health hazards of exposure to manganese in welding fumes, under Restatement (Second) of Torts §876(b) as alleged herein.

151.    Moreover, these Defendants also acted in concert with Warning Defendants in their tortious failure to investigate or test the welding consumables that the Plaintiff used  for any adverse health effects of exposure to manganese in welding fumes pursuant to their common design or plan not to test welding consumables under Restatement (Second) of Torts § 876(a) as

alleged herein.

**152.** Lastly, Defendants were joint and concurrent tortfeasers with Warning Defendants in their failure to investigate or test its welding consumables for any adverse health effects of exposure to manganese in welding fumes as alleged herein.

**153.** Since the 1930's, Defendants individually, collectively, and through their membership and participation in NEMA and AWS, knew of the association between exposure to manganese in welding fumes and neurological injury.

**154.** Since the mid 1970's, Defendants knew that an epidemiological study was necessary to determine the extent and the prevalence of the association between exposure to manganese in welding fumes and neurological injury.

**155.** Defendants also knew that Warning Defendants had failed to conduct such an epidemiological study or sufficiently test their welding consumables.

**156.** Defendants also knew that Warning Defendants and the rest of the welding industry looked to them, AWS Safety and Health Committee, and NEMA for guidance and leadership on whether an epidemiological study of neurological injury and exposure to welding fumes was necessary or warranted.

**157.** However, Defendants, individually, collectively, and through their membership and participation in AWS's "Safety and Health" Committee and NEMA, refused to develop, conduct, support, or fund such a necessary epidemiological study or otherwise test their welding consumables.

**158.** Defendants' refusal to test their consumables or conduct, support, or fund an epidemiological study of the association between neurological injury and exposure to welding fumes substantially assisted, encouraged and justified Warning Defendants continual failure to

investigate or test their products or conduct any epidemiological study. Defendants, through their refusal to conduct an epidemiological study, also acted in concert with Warning Defendants in their failure to investigate and test, pursuant to their common design not to investigate or test, and further, as joint and concurrent tortfeasors in Warning Defendants failure to investigate or test.

159. Such conduct and injury proximately caused Plaintiff injury and damage.

## TENTH CLAIM--LIABILITY TO PLAINTIFF
## FOR NEGLIGENT PERFORMANCE OF UNDERTAKING

160. The Plaintiffs re-allege and incorporate the foregoing allegations as if fully rewritten herein.

161. Defendants, individually, collectively, and as members and participants in AWS and NEMA, held themselves out to Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community as the leaders in all issues relating to the health and safety of welders and welding fumes.

162. Defendants, individually, collectively, and as members and participants in AWS's "Safety and Health Committee" and NEMA, undertook the duty to:

"The AWS Task Group on Welding Fumes recommends that the AWS reconfirm as a Society policy active leadership in all (emphasis in the original) aspects of the health and safety problems in welding and allied fields, aggressively pursuing the solutions to these problems with other professional organizations, industry, government and labor."

"It is the duty of this committee to promote knowledge concerning occupational and environmental effects on the health and safety of personnel involved in welding and allied processes, including the storage and handling of welding equipment and materials."

"It is the duty of this committee to develop safe practices and standards for such processes, to ensure a safe working environment for welders and associated personnel."

**163.** Defendants, individually, collectively, and as members and participants in AWS and NEMA, voluntarily undertook the duty to inform and apprise Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community of all issues relating to the health and safety of welders and welding fumes, including the risk of neurological injury from manganese in welding fumes and how to avoid such injury. This was done through their role in developing the warnings and MSDS on the welding consumables used by the Plaintiff as well as their role in the publication of welder health and safety publications and medical/scientific articles, including Met Life's "Health Protection of Welders" and "Health Protection in Welding" and AWS's "Batelle Report," "Franklin Research Report," and "Effects of Welding on Health" publications.

**164.** Defendants negligently performed the duties they undertook to provide to Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community under Restatement (Second) of Torts § 324A in the following ways.

**165.** In undertaking the duties alleged above, Defendants, individually, collectively, and through their membership and participation in AWS and NEMA, failed to exercise reasonable care in informing Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community of the Plaintiff's risk of suffering neurological injury from his exposure to manganese in welding fumes or how to avoid such injury.

**166.** Defendants, as the self proclaimed leaders and trustees of welding health and safety issues, knew or should have known that Plaintiff, his employer, OSHA and other governmental agencies, ACGIH, the welding industry and the public health community would

rely on Defendants' undertakings concerning welder safety, Plaintiff's risk of neurological injury from exposure to manganese in welding fumes, and how to avoid such dangers in developing safety rules and regulations; product testing; welder safety programs; welding fume and manganese exposure limits; and other precautions concerning welder safety.

167.    Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community did in fact rely on Defendants' undertakings on issues relating to welder safety and health, Plaintiff's risk of neurological injury from exposure to manganese in welding fumes, and how to avoid such dangers in developing safety rules and regulations; welder safety programs; welding fume and manganese exposure limits; and other precautions concerning welder safety.

168.    Defendants' failure to exercise reasonable care in informing Plaintiff, his employer, OSHA and other governmental agencies, ACGIH, the welding industry, and the public health community of Plaintiff's risk of developing neurological injury from exposure to manganese in welding fumes or how to avoid such injury proximately caused his neurological injury.  Had Defendants accurately and truthfully informed Plaintiff, his employers, OSHA and other governmental agencies, ACGIH, the welding industry and the public health community of the actual dangers of exposure to manganese in welding fumes and how to avoid such dangers, they would have taken sufficient precautions and other measures that would have protected Plaintiff from his neurological injury.  Defendants are therefore liable to the Plaintiff for their negligent undertaking.


WHEREFORE, Plaintiff demands judgment from Defendants, jointly and severally, for compensatory and punitive damages in an amount exceeding the minimal jurisdictional limit of

the court, pre-judgment interest from the date of judicial demand, interest on the judgment at the legal rate until paid, attorney's fees, and costs of court.

## JURY DEMAND

The Plaintiff demands a trial by jury of the maximum number of jurors allowed by law.

Dated: December 15, 2008                     Respectfully submitted,

                                             s//Daniel E. Becnel, Jr.
                                             Daniel E. Becnel, Jr. (2926)
                                             Becnel Law Firm, LLC
                                             P.O. Drawer H
                                             Reserve, LA 70084
                                             Telephone:     985. 536.1186
                                             Facsimile:     985. 536.6445
                                             dbecnel@becnellaw.com

## Certificate of Service

I hereby certify that on December 15, 2008 a true copy of the foregoing was filed electronically.  Notice of this filing was sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM / ECF system.

                                             Respectfully submitted,

                                             _/s/Daniel E. Becnel, Jr.___
                                             **One of the Attorneys for Welding Rod
                                             Plaintiffs**